FILED IN CHAMBERS
U.S.D.C. Atlanta

FEB 15 2006

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WHITEBOX CONVERTIBLE ARBITRAGE PARTNERS, L.P., and PANDORA SELECT PARTNERS, L.P., | |
| Plaintiffs, | CIVIL ACTION |
| v. | NO. 1:04-CV-1350-RLV |
| WORLD AIRWAYS, INC., | |
| Defendant. | |

## O R D E R

This action for breach of contract was originally filed in the United States District Court for the District of Minnesota but was subsequently transferred to this court. The complaint alleges that World Airways, Inc., breached the redemption provisions of the indenture governing World Airways's Convertible Senior Subordinated Debentures due 2004 ["2004 Convertibles"]. Pending before the court is the defendant's motion for summary judgment [Doc. No. 49].

## I. FACTUAL BACKGROUND[1]

In August 1997 World Airways issued shares of 8% Convertible Senior Subordinated Debentures due 2004, which, by their terms, were convertible into common shares of World Airways. These

---

[1] Much of this background information is drawn from the court's September 9, 2005, order denying the plaintiff's motion for leave to amend their complaint.

debentures were governed by an Indenture dated August 1, 1997, between World Airways and First Union National Bank as Trustee. The 2004 Convertibles were redeemable, in whole or in part, at the option of World Airways starting on August 26, 2000, at prices ranging from 104.571% to 101.143% of the principle amount, depending on the year when the shares were redeemed.[2] As of July 2003, approximately $40.5 million 2004 Convertibles were outstanding. At all relevant times, Whitebox Convertible Arbitrage Partners, L.P., held $2,530,000 of the 2004 Convertibles, and Pandora Select Partners, L.P., held $780,000 of the 2004 Convertibles.

In 2003, World Airways sought a federal loan guarantee of $27,000,000 to support a $30,000,000 new term loan that the company was seeking from commercial lenders. As a requirement for approving the guarantee, the Air Transportation Stabilization Board required a restructuring of the debt represented by the 2004 Convertibles. At the time it was seeking the loan guarantee, World Airways did not have sufficient cash to redeem all of the 2004 Convertibles. World Airways sought to avoid this problem by redeeming only a portion of the 2004 Convertibles and exchanging

---

[2] During the twelve-month period following August 26, 2003, the shares were redeemable at 101.143%.

the remaining 2004 Convertibles for newly-issued 8% Convertible Senior Subordinated Debentures. Consequently, on July 23, 2003, World Airways made a public exchange offer to all 2004 Convertibles bondholders to accomplish the necessary restructuring ["Public Exchange Offer"]. Pursuant to the Public Exchange Offer, existing 2004 Convertibles bondholders who tendered their bonds would receive new World Airways bonds in the same principle amount, yielding 8% interest and maturing in 2009. The effective six-year extension of the favorable 8% interest rate, along with the lower conversion price, made these new bonds substantially more valuable than the 2004 Convertibles, the remainder of which were to be redeemed.

The Public Exchange Offer required that 95% of existing bondholders tender their bonds in order for the offer to become effective. Both plaintiffs tendered all of their 2004 Convertibles in accordance with the requirements of the Public Exchange Offer.

According to the plaintiffs, during the period of the Public Exchange Offer, World Airways was negotiating with select holders of the 2004 Convertibles to consummate a private exchange deal ["Private Exchange Offer"] that would meet the company's need to secure the federal loan guarantee. Because these select bondholders held approximately half of the outstanding 2004

3

Convertibles, the 95% threshold for the Public Exchange Offer could not be met if they did not participate. Under this Private Exchange Offer, only the select bondholders would receive the more favorable 2009 Convertibles.

On October 10, 2003, World Airways announced that the Public Exchange Offer had expired since an insufficient number of 2004 Convertibles bondholders had tendered their bonds (presumably because none of the select bondholders had tendered theirs). On November 11, 2003, World Airways announced its agreement with the select bondholders to exchange $25,545,000 in newly issued bonds maturing in 2009, bearing interest at 8% with a strike price of $3.20 for $22,545,000 2004 Convertibles held by the select bondholders and $3,000,000 in cash. Simultaneously, World Airways announced that it was redeeming the remaining 2004 Convertibles, including those of the plaintiffs, for cash.

The plaintiffs subsequently filed this action alleging that they (along with other minor holders of 2004 Convertibles) were unilaterally designated by World Airways for the redemption rather than the Private Exchange Offer and that such designation was a breach of the terms of the August 1, 1997, Indenture. The plaintiffs also allege that the defendant breached its contractual duty of good faith and fair dealing by manipulating the process by

4

which certain bondholders were given preferential treatment in having their bonds exchanged or redeemed.

## II. LEGAL DISCUSSION

In determining whether World Airways breached the indenture, the court is guided by the overarching principle that contracts which are clear and unambiguous are to be interpreted according to their plain meaning. *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 780 N.E.2d 166 (2002).[3]  With that principle in mind, the court turns to the relevant provisions of the Indenture.

Section 309 provides in relevant part: "The Company may at any time deliver to the Trustee for cancellation any Securities previously authenticated and delivered hereunder which the Company *may have acquired in any manner whatsoever*, and all Securities so delivered shall be promptly canceled by the Trustee." (emphasis added)

Second 1104 provides in relevant part:

> If less than all the Securities are to be redeemed, the particular Securities to be redeemed shall be selected not more than 60 days prior to the Redemption Date by the Trustee, from the Outstanding Securities not previously called for redemption, *by lot or pro rata or by such other method as the Trustee shall deem fair and*

---

[3] Paragraph 112 of the Indenture provides that it is to be construed in accordance with the law of New York, without regard to that state's principles of conflict of laws.

5

> *appropriate* and which may for the selection for redemption of portions (equal to $1,000 or any integral multiple thereof) of the principle amount of Securities of a denomination larger than $1,000.

(emphasis added)

World Airways argues that it fulfilled its obligations under the Indenture by paying the plaintiffs the redemption price provided for under section 1107 of the Indenture.[4] According to World Airways, because the plaintiffs received the redemption price, there was no breach of the Indenture and thus, the plaintiffs, suffered no injury. World Airways argues that since the December 30, 2003, redemption call involved all shares then outstanding, the provisions of section 1104, which relate to partial redemptions, are inapplicable. This argument ignores the manner in which the private exchange and the later redemption call were effectuated and also ignores the implied covenant of good faith and fair dealing in contracts recognized by New York law.

Even if section 1104 itself did not mandate good faith and fair dealing, New York law independently requires such good faith and fair dealing. This duty is composed of "any promises which a reasonable person in the position of the promisee would be

---

[4] Section 1107 provides simply that once proper notice of redemption has been given, the Securities are due and payable at the redemption price provided for in the Indenture and that the Securities no longer bear interest after that date.

6

justified in understanding were included" in the contract. *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995); *see also National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520 (2d Cir. 2004).

In the instant case, World Airways essentially conducted two partial redemptions--one through the Private Exchange Offer and the other through the December 30 redemption--but treated those persons redeeming their bonds significantly differently. Such disparity in treatment is precisely what section 1104 prohibits.

It appears that World Airways provided a special incentive to certain bondholders in an effort to obtain their approval of a bond exchange while not making the same offer to other bondholders. Such negotiations may have been the reason the Public Exchange Offer was doomed to failure, while ensuring the success of the Private Exchange Offer to those favored bondholders. The fact that *all* bonds were redeemed immediately after the Private Exchange was effected is meaningless once it is understood that this *full* redemption took place only after another, partial redemption occurred. It is such manipulation that section 1104 and the principles of good faith and fair dealing are designed to avoid.

World Airways refers to section 309 and argues that that section allows it to conduct a partial redemption through a private

exchange offer. However, as noted earlier, that section merely provides that bonds tendered to the Trustee must be cancelled regardless of how those bonds were acquired. This provision places a duty on the Trustee to cancel bonds; it does not provide a method whereby World Airways might obtain bonds that would otherwise be prohibited by the Indenture or the principle of good faith and fair dealing.

Finally, World Airways argues that the plaintiffs are prohibited from bringing this action because of section 507. That section provides in relevant part that no holder of the 2004 Convertibles may institute any proceeding with respect to the Indenture unless

> (1) such Holder has previously given written notice to the Trustee of a continuing Event of Default;
> (2) the Holders of not less than 25% in principal amount of the Outstanding Securities shall have made written request to the Trustee to institute proceedings in respect to such Event of Default in its own name as Trustee hereunder;
> (3) such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses, and liabilities to be incurred in compliance with such request;
> (4) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute such proceedings; and
> (5) no direction inconsistent with such written request has been to the Trustee during such 60-day period by the Holders of a majority in principal amount of the Outstanding Securities.

The plaintiffs concede that they did not provide written notice to the Trustee of the claims asserted in their complaint nor did they ask the Trustee to institute proceedings in his own name. However, the court holds that the plaintiffs were not required to follow the procedure set out in section 507 because no-action clauses are strictly construed and are generally not applicable in wrongful redemption suits.

> The primary purpose of a no-action clause is to:
>
> protect issuers from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors. In protecting the issuer such clauses protect bondholders. They protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective interest. Once the [bonds] were redeemed, there were no [bond] holders, and hence no holders in need of the protection against unworthy lawsuits that no-action clauses are designed to provide.
>
> Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 21-22 (Del. Supr. 2001) (interpreting New York law).

Enforcing the no-action clause in the instant case would not serve the purposes for which it was placed in the Indenture. Moreover, Worldwide Airways's own actions made compliance with the clause impossible. The clause requires a bondholder to wait 60 days before filing suit. However, the redemption call was announced on December 30, 2003, for redemption to take place on January 28,

2004. Since the Indenture was terminated, and the Trustee discharged, within the 60-day period required by the no-action clause, it would have been impractical to bring suit after the 60-day period.

For all the foregoing reasons, World Airways's motion for summary judgment [Doc. No. 49] is DENIED.[5]

SO ORDERED, this 15TH day of February, 2006.

_____
ROBERT L. VINING, JR.
Senior United States District Judge

---

[5] In denying World Airways's motion for summary judgment, the court is not holding that World Airways breached the Indenture, and nothing in this order should be construed to reach that conclusion. Whether the actions of World Airways constituted a breach of the Indenture is a question for the jury.